IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BAILEY REYNOLDS and HELEN MARTINEZ on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | **CA No.: 1:18-cv-423** |
| v. | ) ) | **COLLECTIVE AND CLASS ACTION COMPLAINT** |
| FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC., and FMR, LLC, | ) ) ) ) | |
| *Defendants.* | ) ) | |

Plaintiffs Bailey Reynolds and Helen Martinez (collectively "Named Plaintiffs"), by and through counsel, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), hereby set forth this collective and class action against Defendants Fidelity Investments Institutional Operations Company, Inc. and FMR, LLC (collectively "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1. This action arises out of Defendants' systemic, company-wide failure to compensate Plaintiffs for all hours worked, and for overtime hours worked at the appropriate overtime rate, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq.*, and the New Mexico Minimum Wage Act ("NMMWA"), N.M. Stat.

1

Ann. § 50-4-1, *et seq.*

2.     Plaintiffs consist of current and former Financial Customer Associates, or similar positions, who are compensated on an hourly basis.  Throughout the relevant period, Defendants have maintained a corporate policy of failing to compensate Plaintiffs for all mandatory pre-shift work.  In particular, Defendants required Plaintiffs to arrive at work prior to their scheduled shift in order to perform a litany of tasks necessary to perform their jobs, including booting up computers, running several software programs, checking daily bulletins, reviewing call schedules, checking emails, checking callbacks, and organizing their desks.  Plaintiffs only received compensation after this work had been completed, though they were required to perform this work in order to be prepared to answer phone calls when their scheduled shifts began.  This work was required to be completed to be "call ready."  Failure to be "call ready," or prepared to answer phone calls when their scheduled shifts began, could result in warnings, discipline, and ultimately, termination.

3.     Defendants, through their managers, were aware that Plaintiffs were completing this pre-shift work, and doing so without compensation.  Defendants suffered or permitted, and in fact, required Plaintiffs to complete such pre-shift work.

4.     Plaintiffs routinely worked 40 hours or more per week, without accounting for pre-shift work.  When pre-shift work is included, even those Plaintiffs who were scheduled and paid for only 40 hours per week, actually worked over 40 hours per week without being compensated for the pre-shift work or compensated at the overtime rate for

2

hours worked over 40 per week.

5. Throughout the relevant period, Defendants have also maintained a corporate policy of underpaying and failing to lawfully compensate Plaintiffs at the appropriate overtime rates. Defendants issued quarterly "bonuses" to Plaintiffs, based on objective, nondiscretionary metrics, including length of employment, customer survey ratings, schedule adherence, and idle/RAP time. Defendants, however, failed to take into account such nondiscretionary bonuses during overtime workweeks when calculating Plaintiffs' regular and overtime rates. Similarly, Defendant provided additional compensation to Plaintiffs through student loan reimbursements and fitness reimbursements, but failed to take that compensation into account when calculating Plaintiffs' regular and overtime rates, and thus failed to pay overtime at the correct rate.

6. Defendants' practices of failing to compensate Plaintiffs for all pre-shift work and failing to compensate Plaintiffs at the appropriate overtime rate for overtime hours worked, violated Plaintiffs' rights under the FLSA, NCWHA, and NMMWA.

7. Plaintiffs bring this action for violation of the FLSA as a collective action, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the following class nationwide:

> All individuals who were, are, or will be employed by Defendants as Financial Customer Associates, or in similar positions, at any time within the three (3) years prior to the date of commencement of this action, through the date of judgment or final disposition in this action, and who did not receive compensation for all required pre-shift work, and who did not receive all overtime compensation due for hours worked in excess of forty (40) per week.

3

8. Defendants are liable for their failure to pay Plaintiffs for all work performed, and at the appropriate overtime rate for hours worked in excess of forty (40) per week.

9. Plaintiffs who elect to participate in this FLSA collective action seek compensation for all pre-shift work performed for Defendants, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

10. Plaintiff Bailey Reynolds ("Plaintiff Reynolds") also brings this action, on her own behalf, and as a representative of similarly situated current, former or future Financial Customer Associates, or similar positions, employed by Defendants in North Carolina, under the NCWHA. Plaintiff Reynolds, who is a North Carolina resident and who worked for Defendants in North Carolina, asserts that she and the putative class, who work or worked in North Carolina for Defendants, are entitled to compensation for all pre-shift work performed for Defendants, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.6, 95-25.22(a), (a1), and (d).

11. Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendants' employees in North Carolina:

> All individuals who were, are, or will be employed by Defendants in North Carolina as Financial Customer Associates, or in similar positions, at any time within the two (2) years prior to the date of commencement of this action

4

through the date of judgment or final disposition in this action, and who did not receive compensation for all required pre-shift work, and who did not receive all overtime compensation due for hours worked in excess of forty (40) per week.

12.    Helen Martinez ("Plaintiff Martinez") also brings this action, on her own behalf, and as a representative of similarly situated current, former or future Financial Customer Associates, or similar positions, employed by Defendants in New Mexico, under the NMMWA. Plaintiff Martinez, who is a New Mexico resident and who worked for Defendants in New Mexico, asserts that she and the putative class, who work or worked in New Mexico for Defendants, are entitled to compensation for all pre-shift work performed for Defendants, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to N.M. Stat. Ann. §§ 50-5-2, 50-4-15, 50-4-22(D), 50-4-26(C), (D), (E), and (G).

13.    Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendants' employees in New Mexico:

> All individuals who were, are, or will be employed by Defendants in New Mexico as Financial Customer Associates, or in similar positions, at any time within the three (3) years prior to the date of commencement of this action through the date of judgment or final disposition in this action, and who did not receive compensation for all required pre-shift work, and who did not receive all overtime compensation due for hours worked in excess of forty (40) per week.

14.    This action also arises out of Defendants' systemic, company-wide practice of mandating that employees taking approved leave pursuant to the Family Medical Leave

Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, substitute *unaccrued* paid vacation leave, personal leave, family leave, or general paid time off (collectively "PTO") for leave without pay permitted under the FMLA.

15.     Throughout the relevant period, Defendants have maintained a corporate policy of requiring that Plaintiffs, upon receiving approval to take FMLA leave, substitute unaccrued PTO for leave without pay that they were lawfully entitled to under the FMLA. If Plaintiffs had accrued PTO available, Defendants would substitute such time for leave permitted under the FMLA first (a practice Plaintiffs do not challenge), but if Plaintiffs did not have accrued PTO available, they would be forced to use unaccrued PTO to take leave under the FMLA. Such unaccrued PTO would then have to be "earned" by Plaintiffs *after* taking leave under the FMLA, and such "earnings" would compensate for unaccrued PTO substituted for FMLA leave. If Plaintiffs terminated their employment with Defendants, voluntarily or involuntarily, prior to retroactively "earning" unaccrued PTO, Plaintiffs were required to pay Defendants back for such time off, even though the time off was lawfully taken pursuant to the FMLA.

16.     Plaintiff Reynolds, a Financial Customer Associate at Defendants' Durham, North Carolina location, was permitted to take FMLA leave by Defendants, but was required to use unaccrued PTO in place of leave without pay provided by the FMLA. Upon her termination, Plaintiff Reynolds had not yet "earned" sufficient PTO to pay Defendants back for the leave she had taken under the FMLA, and she was thereafter required to pay Defendants for such time, in cash, at her regular hourly rate.

6

17. Plaintiff Reynolds seeks class certification for her FMLA claim under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class nationwide:

> All individuals who were, are, or will be employed by Defendants nationwide as Financial Customer Associates, or in similar positions, at any time within the three (3) years prior to the date of commencement of this action through the date of judgment or final disposition in this action, and who were permitted or required by Defendants to use unaccrued PTO to substitute for leave without pay permitted under the FMLA, and who were subsequently required to compensate Defendants for the unaccrued PTO.

18. Plaintiff Reynolds, and plaintiffs similarly situated for Defendants' FMLA violation, seek all wages, salary, benefits, or other compensation denied to or lost by such employees, any sums paid to Defendants to pay back unaccrued PTO taken in place of FMLA leave, or monetary losses sustained by employees as a result of Defendants' FMLA violation, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to Section 107 of the FMLA, 29 U.S.C. § 2617.

## JURISDICTION AND VENUE

19. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based upon the claims brought under the FLSA, 29 U.S.C. § 201, *et seq.*, and the FMLA, 29 U.S.C. § 2601, *et seq.*

20. Independently, the Court has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332, because there exists diversity of citizenship for purposes of CAFA, and because there are over 100 putative class members in each of the state-law classes, and the total amount in controversy for each state-law class exceeds $5 million. Such diversity exists as at least one member of each putative class is

a citizen of a state other than the states of Defendants' citizenship.

21.     Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the NCWHA, NMMWA, and because those state law claims arise out of the same nucleus of operative fact as the FLSA claims.

22.     The United States District Court for the Middle District of North Carolina has personal jurisdiction because Defendants conduct business in Durham County, North Carolina, which is located within this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendants conduct business and can be found within the Middle District of North Carolina, and the substantial part of the events or omissions giving rise to these claims occurred in this District.

24.     All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

## PARTIES

25.     Plaintiff Reynolds is an adult resident of North Carolina, residing at 3939 Glenwood Ave., #354, Raleigh, North Carolina 27612.  She worked as a Financial Customer Associate for Defendants at their Durham, North Carolina location from approximately November 2015, until May 16, 2017.  Her scheduled shift was typically 8:30 a.m. through 5:00 p.m., Monday through Friday.

26.      Helen Martinez is an adult resident of New Mexico, residing at 7621 San Benito Street NW, Albuquerque, NM 87120.  She worked as a Financial Customer

Associate for Defendants at their Albuquerque, New Mexico location from approximately September 2013, until October 2016. Her scheduled shift was typically 6:30 am to 3:00 pm, Monday through Friday.

27. Defendant Fidelity Investments Institutional Operations Company, Inc. is incorporated in Massachusetts, and has its principal place of business located at 245 Summer Street, ZW9A, Boston, MA 02210.

28. Defendant FMR, LLC is a privately-held multinational financial services firm organized under Delaware law and headquartered in Massachusetts and has its principal place of business located at 245 Summer Street, ZW9A, Boston, MA 02210.

29. According to their website, Defendants provide financial planning and retirement options such as IRAs, annuities, and managed accounts; brokerage and case management products; college savings accounts; and other financial services for millions of individual investors. Defendants also work with employers to build benefit programs and provide recordkeeping, investments, and administrative services for employer offerings; and provide investment products, brokerage, and trading services to financial firms.

30. Among other things, Fidelity has more than $6,000,000,000,000 (six trillion) in assets under management.

31. According to their website, at all relevant times, Defendants employ more than 40,000 (forty thousand) employees, thousands of them on an hourly basis all over the United States.

9

32.     At all relevant times, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d), the FMLA, 29 U.S.C. § 2611(4), the NCWHA, N.C. Gen. Stat. § 95-25.2(5), the NMMWA, N.M. Stat. Ann. § 50-4-21(B).

33.     At all relevant times, Defendants operated as an enterprise within the meaning of 29 U.S.C. § 203(r)(1).

34.     At all relevant times, Plaintiffs were employees engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207.

35.     At all relevant times, Defendants have had gross operating revenues in excess of $500,000, consistent with 29 U.S.C. § 203(s)(1)(A)(ii).

## FACTUAL ALLEGATIONS

36.     According to their website, Defendants employ more than 40,000 associates, with several thousand employed as Financial Customer Associates, or in similar positions, throughout the entire United States, in over 190 investor centers.

37.     Defendants employ Financial Customer Associates, or similar positions, to work in call centers and communicate with current and prospective customers to help navigate various issues with which they may require assistance, including, but not limited to, 401(k) issues, pension issues, mutual funds issues, and issues related to other financial and investment vehicles that Defendants offer.

38.     Defendants compensate Financial Customer Associates, or similar positions, on an hourly basis.  Defendant classifies these employees as non-exempt under the FLSA.

39.     Plaintiff Reynolds and Plaintiff Martinez worked for Defendants as Financial

Customer Associates, or in similar positions, during the relevant period.

## A. Unpaid and Required Pre-Shift Work

40.     Defendants require Financial Customer Associates to work scheduled shifts, typically eight and one-half (8.5) hour shifts, five (5) days per week, with a thirty (30) minute unpaid lunch break each day.  However, at some of Defendants' call center locations, Financial Customer Associates are required to work between 50 and 60 hours per week.

41.     During the relevant period, Defendants utilized two distinct company policies regarding compensation for required pre-shift work.

42.     Defendants' first policy (hereinafter "Policy One"), in place from at least the beginning of the relevant period, until approximately July 2016, compensated Financial Customer Associates for six (6) minutes of required pre-shift work each day, regardless of the amount of time required to perform such pre-shift work.

43.     Although Policy One compensated Financial Customer Associates for six (6) minutes of required pre-shift work each day, Financial Customer Associates typically performed approximately ten (10) to fifteen (15) minutes of pre-shift work during this period, including manually booting up computers, launching software programs (including Focus Point Xtrac, the time-tracker program, FPRS, a mainframe database, internal webpages, and separate databases), checking daily bulletins, reviewing the call schedule, checking emails, checking callbacks, and organizing desks.  Because these duties had to be performed and programs launched by Financial Customer Associates before their time

11

would be automatically recorded by the time-tracker program (which transferred data to a program called Artic), their time engaged in such activities was not properly captured or compensated.

44.     This required, pre-shift work performed under Policy One had to be performed prior to the beginning of each shift in order for Financial Customer Associates to be "call ready," or prepared to answer calls, at the beginning of their scheduled shifts.

45.     Defendants mandated that Financial Customer Associates be "call ready" when their scheduled shifts began, necessitating the aforementioned required pre-shift work under Policy One.

46.     If Financial Customer Associates were not "call ready" when their scheduled shifts began, they risked receiving "tardies" on their records.  Multiple "tardies" could result in formal warnings, disciplinary action, or termination from employment.

47.     If Financial Customer Associates arrived immediately prior to the beginning of their scheduled shifts, they could not feasibly be able to perform all required pre-shift work necessary to be "call ready" when their scheduled shifts began, and they would therefore receive "tardies" on their records.  They also would not be compensated for any work until they were "call ready."

48.     Under Policy One, from the beginning of the relevant period until approximately January 2016, Financial Customer Associates were able to log into the time-tracker program at any time, but they were required to retroactively remove all but six (6) minutes of pre-shift work from such records, and only the six minutes would be

compensated. From approximately January 2016 until July 2016, still while under Policy One, Financial Customer Associates were expressly instructed not to log into the time-tracker program more than six (6) minutes before the beginning of their scheduled shifts. Thus, they were limited to recording in the time-tracker program only the six (6) minutes of pre-shift time provided for by Policy One; they were effectively inhibited from reporting the remainder of the required pre-shift work performed prior to the start of their shift, and Defendants employed a company-wide policy of not compensating for such required pre-shift work. Managers who found pre-shift work included on an employee's timesheet, would remove it, or instruct employees to remove it, pursuant to company policy. Artic, which reflects time recorded in the time-tracker program, makes it possible to view what time was retroactively added or removed from an employee's time records.

49. Defendants' second policy (hereinafter "Policy Two"), in place from approximately July 2016 until the present, ceased the practice of compensating Financial Customer Associates for six (6) minutes of required pre-shift work each day, and did not compensate Financial Customer Associates for *any* work performed prior to the beginning of their scheduled shifts, and prior to their "call ready" status.

50. When Policy Two was enacted, Defendants no longer required that Financial Customer Associates manually boot up their computers. Instead, computers were booted up, and prepared with necessary login information, automatically. This change reduced the amount of pre-shift work required by Financial Customer Associates each day. However, Financial Customer Associates were still required to perform approximately five

13

(5) minutes of pre-shift work each day, including launching all software programs (including Focus Point, Xtrac, Time Tracker, a mainframe database, internal webpages, and separate databases), checking daily bulletins, reviewing the call schedule, checking emails, checking callbacks, and organizing desks.

51.     This required pre-shift work performed under Policy Two had to be performed prior to the beginning of each shift in order for Financial Customer Associates to be "call ready," or prepared to answer calls, at the beginning of their scheduled shifts.

52.     Defendants mandated that Financial Customer Associates be "call ready" when their scheduled shifts began, necessitating the required pre-shift work under Policy Two.

53.     If Financial Customer Associates were not "call ready" when their scheduled shifts began, they risked receiving "tardies" on their records.  Multiple "tardies" could result in formal warnings, disciplinary action, or termination from employment.

54.     If Financial Customer Associates arrived immediately prior to the beginning of their scheduled shifts, they could not feasibly perform all pre-shift work necessary during Policy Two to be "call ready" when their scheduled shifts began, and they would therefore receive "tardies" on their records.  They also would not be compensated for any work until they were "call ready."

55.     Under Policy Two, although Financial Customer Associates could manually enter start-up time on a timesheet, Financial Customer Associates were instructed not to enter such time manually and not to log into the time-tracker program until one (1) minute

14

prior to the start of their scheduled shift, at which point they would enter "Ready" status. Therefore, Financial Customer Associates were typically not compensated for any pre-shift work performed during Policy Two, as Defendants employed a company-wide policy of not compensating for such pre-shift work. Managers who found pre-shift work included on an employee's timesheet, would remove it, or instruct employees to remove it, pursuant to company policy.

56.    Plaintiff Reynolds typically worked approximately ten (10) to fifteen (15) minutes of pre-shift work under Policy One, and five (5) minutes of pre-shift work under Policy Two, though she was not compensated for all such time worked. For example, from approximately November 2015 to July 2016, during Policy One, Plaintiff Reynolds worked an average of ten (10) minutes per day for pre-shift work activities. During Policy One, Plaintiff Reynolds worked approximately 40.83 hours per week, including pre-shift work during at least one workweek, but was only compensated for forty 40.5 hours of work; and from July 2016 to the date of termination, during Policy Two, Plaintiff Reynolds worked 40.42 hours, including pre-shift work, but was only compensated for forty (40) hours of work. In the aggregate, during her entire period of employment, Plaintiff Reynolds was not paid a minimum of $553.41 for unpaid pre-shift work.

57.    Plaintiff Martinez typically worked approximately ten (10) to fifteen (15) minutes of required pre-shift work during Policy One, and five (5) minutes of pre-shift work during Policy Two, though she was not compensated for all such time worked. For example, from approximately September 2013 to July 2016 during Policy One, Plaintiff

Martinez worked an average of 12.5 minutes per day for pre-shift work activities. During Policy One, Plaintiff Martinez worked approximately 61.04 hours per week, including pre-shift work during at least one workweek, but was only compensated for 60.5 hours of work; and from July 2016 to October 2016, during Policy Two, Plaintiff Martinez worked approximately 60.5 hours, including pre-shift work, but was only compensated for sixty (60) hours of work. In the aggregate, for just one year, Plaintiff Martinez was not paid a minimum of $758 for unpaid pre-shift work.

58. Defendants' failure to compensate for all pre-shift work performed has affected all Plaintiffs similarly.

### B. Unpaid Overtime – Nondiscretionary Bonuses

59. All or most Financial Customer Associates were scheduled for and worked at least a full forty (40) hours per week, not including the required pre-shift work described above. Even those scheduled for 40 hours occasionally worked longer, such as when phone calls with customers did not end prior to the conclusion of their scheduled shifts. In some locations and time periods, Financial Customer Associates typically were scheduled for and worked fifty (50) to sixty (60) hours per week, not including the required pre-shift work described above.

60. Financial Customer Associates were compensated at one and one-half (1.5) times their regular hourly rate for all hours Defendants counted as work in excess of forty (40) each week, but not for the uncompensated required pre-shift work described above.

61. Throughout the relevant period, Defendants have issued, as part of their

16

compensation, at least two types of quarterly bonuses to Financial Customer Associates, which are identified on wage statements as "Bonus Eligible" and "Pr Yr Bon ELI."

62.     Defendants' quarterly bonuses were nondiscretionary, and were based on objective metrics, including length of employment, customer survey ratings, schedule adherence, and idle/RAP time, pursuant to a formula established by Defendants.

63.     Although Defendants' quarterly bonuses were part of Financial Customer Associates' compensation, such bonuses were not discretionary, and were based on objective metrics. Despite such objective metrics, Defendants did not take into account such nondiscretionary bonuses when calculating Financial Customer Associates' regular and overtime rates.

64.     Accordingly, the overtime rates paid by Defendants did not vary regardless of the sum of Financial Customer Associates' regular earnings, nondiscretionary bonuses and other incentive payments, and regardless of the extent to which the nondiscretionary bonuses would have increased the regular hourly rates.

65.     Plaintiff Reynolds typically received between $150 and $1,000 in quarterly bonuses, and occasionally worked hours in excess of forty (40) per week (exclusive of the pre-shift work described above), but only received overtime at a rate of one and one-half (1.5) times her ordinary hourly rate for all hours worked in excess of forty (40) each week, which did not incorporate the amount of the nondiscretionary bonuses. For example, during at least one week when a quarterly bonus was given to Plaintiff Reynolds, Plaintiff Reynolds worked hours in excess of forty (40) per week, but she only received overtime at

17

a rate of one and one-half (1.5) times her ordinary hourly rate, despite the fact that she received a nondiscretionary bonus, which was on average approximately $400 per quarter, and which should have been incorporated in determining Plaintiff Reynolds' regular rate for any overtime worked during any workweek in any given quarter.

66.     Plaintiff Martinez typically received around $1200.00 in quarterly bonuses, and regularly worked hours in excess of forty (40) per week (exclusive of the pre-shift work described above), but only received overtime at a rate of one and one-half (1.5) times her ordinary hourly rate for all hours worked in excess of forty (40) each week, which did not incorporate the amount of the nondiscretionary bonuses.  For example, during at least one week when a quarterly bonus was given to Plaintiff Martinez, Plaintiff Martinez worked hours in excess of forty (40) per week, but she only received overtime at a rate of one and one-half (1.5) times her ordinary hourly rate, despite the fact that she received a nondiscretionary bonus, which was on average approximately $1200 per quarter, and which should have been incorporated in determining Plaintiff Martinez's regular rate for any overtime worked during any workweek in any given quarter.

67.     Defendants' failure to compensate at the appropriate rate for overtime work performed has affected all Plaintiffs similarly.

## C. Unpaid Overtime – Student Loan Program

68.     Throughout the relevant period, Defendants have issued, as part of their compensation to Financial Customer Associates, Student Loan Reimbursements. Defendants pay up to $2000 a year towards each employee's student loans.  In order to be

18

eligible for this program, Financial Customer Associates must work for Defendants for more than six (6) months, must work more than twenty (20) hours a week, and must have satisfactory work performance. According to Defendants' website, more than 5,000 of its employees participate in this program.

69. Plaintiff Reynolds was eligible for this program and participated in it. Defendants paid approximately $150.00 towards Plaintiff Reynold's student loans every month. The entire amount of these monthly payments was imputed to Plaintiff Reynolds as wages on her wage statements.

70. Defendants do not include student loan repayments in calculating the regular rate of pay for overtime purposes for its non-exempt employees. In this way, Defendants reduce the cost of overtime in violation of federal and state wage and hour laws.

**D. Unpaid Overtime – Fitness Reimbursements**

71. Another form of compensation that Defendants pay to its Financial Customer Associates relates to "fitness reimbursements" pursuant to its "Fitness Reimbursement Program." Under this program, Defendants will "reimburse" employees 50% of what they spend, with a cap of $300 a year, for things such as their own or their spouse's gym membership, home exercise equipment, or Fitbit watches.

72. In order to be eligible for the Fitness Reimbursement program, employees must work for Defendants for more than six months and must work more than 20 hours a week. They will only receive the reimbursement if they are actively working.

19

73.     Plaintiff Reynolds was eligible for this program and participated in it.  She received "fitness reimbursements" from Defendants in 2016.  The entire amount of this fitness reimbursement was imputed to Plaintiff Reynolds as wages on her wage statements.

74.     Defendants do not include fitness reimbursements in calculating the regular rate of pay Financial Customer Associates for overtime purposes.  In this way, Defendants reduce the cost of overtime in violation of federal and state wage and hour laws.

**E.   Substitution of Unaccrued PTO for FMLA Leave**

75.     During the relevant period, Financial Customer Associates typically earned twelve (12) hours of PTO for each month they worked for Defendants.

76.     During the relevant period, upon approving requested FMLA leave, Defendants required Financial Customer Associates to substitute accrued PTO, if available, for unpaid leave provided under the FMLA.

77.     If Financial Customer Associates' FMLA leave was approved, but they did not have any accrued PTO remaining at the time FMLA leave was taken, Defendants required such Financial Customer Associates to substitute *unaccrued* PTO for unpaid leave provided under the FMLA.

78.     Defendants told Financial Customer Associates that when they took unaccrued PTO to substitute for unpaid leave provided under the FMLA, they would thereafter "owe" Defendants for such unaccrued PTO taken.

79.     Financial Customer Associates who took unaccrued PTO to substitute for

unpaid leave provided under the FMLA were expected to "earn" the PTO back, at a rate of twelve (12) hours of PTO each month, *after* having already taken approved unaccrued PTO for the FMLA leave.

80.     If a Financial Customer Associate's employment ended prior to his or her ability to retroactively "earn" all unaccrued PTO used to substitute for leave provided under the FMLA, regardless of how such employment ended (whether voluntary or involuntary), Defendants demanded that the Financial Customer Associate pay Defendants back, in cash, for the value of the total hours of unaccrued PTO taken, at such employee's regular hourly rate of pay.

81.     Financial Customer Associates were required by Defendants to "earn" or pay back such unaccrued PTO taken, even though such time off was taken pursuant to the FMLA.

82.     Starting in approximately February 2017, Plaintiff Reynolds received approval to take intermittent FMLA leave.  After she exhausted all her accrued PTO, Defendants required Plaintiff Reynolds to substitute unaccrued PTO for unpaid leave provided under the FMLA.  Upon Plaintiff Reynolds' termination on May 16, 2017, she was informed that she "owed" Defendants for sixty (60) hours of unaccrued PTO taken in 2017, approximately forty (40) hours of which she had been required to take in place of her unpaid FMLA leave.  Accordingly, following Plaintiff Reynolds' termination, Defendants sent her a demand letter for the full sum allegedly owed to them for her unaccrued PTO taken to substitute for unpaid leave provided under the FMLA, which

21

Plaintiff Reynolds has not yet paid.

83.     Defendants' policy or practice of requiring that Financial Customer Associates who take approved FMLA leave use unaccrued PTO, if accrued PTO is not available, interferes with Plaintiffs' FMLA rights and adversely affects them in that they incur an involuntary debt.  Such a policy or practice also discriminates against Plaintiffs in that it is only applied to those individuals who need to take FMLA leave, but do not have the accrued PTO leave to avoid incurring the debt.  It has affected all similarly situated Plaintiffs who have taken FMLA leave.

## F.  Paid Time Off ("PTO") or Vacation Policy

94.     Under 13 NCAC 12.0306, North Carolina employers are not required to provide for vacation or PTO, however, to the extent that such benefits are provided, NCAC 12.0306 requires employers to provide employees with the following:

    (a) All vacation policies and practices shall address:
        (1) How and when vacation is earned so that employees know the amount of vacation to which they are entitled;
        (2) Whether or not vacation time may be carried forward from one year to another, and if so, in what amount;
        (3) When vacation time must be taken;
        (4) When and if vacation pay may be paid in lieu of time off; and
        (5) Under what conditions vacation pay will be forfeited upon discontinuation of employment for any reason.
    (b) Ambiguous policies and practices shall be construed against the employer and in favor employees.

95.     Defendants do not provide the notice required under 13 NCAC 12.0306,

22

to its North Carolina based employees, including Plaintiff Reynolds. This violation is not isolated or unintentional. It is systematic.

## G. Unlawful Retaliation Against Plaintiff Reynolds

84.     Throughout the course of her employment, Plaintiff Reynolds consistently received praise and positive feedback from her supervisors.

85.     In July 2016, Plaintiff Reynolds won an award for being "Team MVP."

86.     Plaintiff Reynolds received Defendants' approval to take intermittent leave pursuant to the FMLA in approximately February 2017.

87.     In April 2017, Plaintiff Reynolds won an award for receiving 100% positive feedback on customer service, for which she received a gift card.

88.     Plaintiff Reynolds was informed, on at least one occasion, that her performance would improve if she stopped taking so much FMLA leave.

89.     Plaintiff Reynolds received negative feedback in or around May 2017, just one month after receiving a performance award, and just prior to her termination, seemingly as a pretext for her termination.

90.     On May 16, 2017, Plaintiff Reynolds was terminated from her employment. Defendants cited poor performance for her termination.

91.     Shortly following her termination, Plaintiff Reynolds received a letter from Defendants stating that she owed them money for all sixty (60) hours of unaccrued PTO taken during her employment, but not yet "earned" back, including approximately forty

(40) hours of which she was required to take in place of her FMLA leave.

92.     Upon information and belief, Defendants terminated Plaintiff Reynolds' employment in retaliation of her taking intermittent FMLA leave, and/or in an effort to profit from the funds that Defendants stated Plaintiff Reynolds owed them, partially as a result of not yet "earning" all unaccrued PTO that Plaintiff Reynolds was required to substitute for approved FMLA leave.

## FLSA COLLECTIVE ACTION ALLEGATIONS

93.     Plaintiffs bring the First Cause of Action of the instant Complaint as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of themselves and all similarly situated employees.

94.     Members of the FLSA class are similarly situated.

95.     Members of the FLSA class have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that fail to compensate them for all work performed and fail to compensate them at the appropriate overtime rate for all hours worked in excess of forty (40) per week.

96.     There are numerous (in excess of 10,000) similarly situated current and former Financial Customer Associates that fall within the scope of the aforementioned FLSA class.

97.     These similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

98.     Members of the proposed FLSA class, therefore, should be permitted to

24

pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

99.     Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Plaintiffs.

100.    Named Plaintiffs consent in writing to assert their claims for unpaid wages under the FLSA pursuant to 29 U.S.C. § 216(b).  Named Plaintiffs' signed consent forms are filed with the Court as Exhibits A through B to this Complaint.  As this case proceeds, it is likely other individuals will file consent forms and join as opt-in plaintiffs.

101.     Plaintiff Reynolds and Plaintiff Martinez request that they be permitted to serve as representatives of those who consent to participate in this action, and that this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## RULE 23 NCWHA CLASS ACTION ALLEGATIONS

103.    Plaintiff Reynolds brings the Second Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all similarly situated employees, for relief to redress and remedy Defendants' violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, *et seq.*

104.    <u>Numerosity</u>:  The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.  While the exact number of class members is unknown to Plaintiff Reynolds at this time, upon information and belief, the class comprises at least 1,800 individuals.

105.    <u>Common Questions Predominate</u>: There is a well-defined commonality of

25

interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendants' failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

    a. Whether pre-shift work performed by putative NC Class Members is compensable under the NCWHA;

    b. Whether Defendants' failure to compensate putative NC Class Members for pre-shift work is in violation of the NCWHA;

    c. Whether Defendants failed to compensate putative NC Class Members at the earned, accrued, and/or promised rate for all hours worked in excess of forty (40) each week; and

    d. Whether Defendants failed to compensate putative NC Class Members for all of their earned, accrued, and/or promised wages, including, but not limited to, straight time and overtime on their regular pay date, in violation of the NCWHA.

106. <u>Typicality</u>: The claims of Plaintiff Reynolds are typical of the claims which could be alleged by any member of the putative NC Class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendants, as alleged herein, of failing to pay employees for all pre-shift work, and for hours worked in

26

excess of forty (40) each week at the appropriate hourly rate. Defendants' compensation policies and practices affected all putative NC class members similarly, and Defendants benefited from the same type of unfair and/or unlawful acts as to each putative NC class member. Plaintiff and members of the proposed NC class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

107. <u>Adequacy of Representation</u>: Plaintiff Reynolds is able to fairly and adequately protect the interests of all members of the proposed NC class, and there are no known conflicts of interest between Plaintiff Reynolds and members of the proposed class. Plaintiff has retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

108. <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual

27

litigation and claims would be substantially greater than if the claims are treated as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties. The issue in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

109. <u>Public Policy Considerations</u>: Defendants violated the NCWHA. Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

110. Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

## RULE 23 NMMWA CLASS ACTION ALLEGATIONS

111. Plaintiff Martinez brings the Third Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all similarly situated employees, for relief to redress and remedy

28

Defendants' violations of the NMMWA, N.M. Stat. Ann. § 50-4-1, *et seq*.

112. <u>Numerosity</u>: The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiff Martinez at this time, upon information and belief, the class comprises at least 1,000 individuals.

113. <u>Common Questions Predominate</u>: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendants' failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

    a. Whether pre-shift work performed by putative NM Class Members is compensable under the NMMWA;

    b. Whether Defendants' failure to compensate putative NM Class Members for pre-shift work is in violation of the NMMWA;

    c. Whether Defendants failed to compensate putative NM Class Members at the appropriate hourly rate for all hours worked in excess of forty (40) each week;

    d. Whether Defendants' failure to compensate putative NM Class Members at the appropriate hourly rate for all hours worked in excess of forty (40) each week is in violation of the NMMWA; and

e. Whether Defendants failed to compensate putative NM Class Members for all of their earned, accrued, and/or promised wages, including, but not limited to, straight time and overtime on their regular pay date, in violation of the NMMWA.

114. <u>Typicality</u>: The claims of Plaintiffs herein are typical of the claims which could be alleged by any member of the class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendants, as alleged herein, of failing to pay employees for all required pre-shift work, and for hours worked in excess of forty (40) each week at the appropriate hourly rate. Defendants' compensation policies and practices affected all putative class members similarly, and Defendants benefited from the same type of unfair and/or unlawful acts as to each class member. Plaintiffs and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

115. <u>Adequacy of Representation</u>: Plaintiffs are able to fairly and adequately protect the interests of all members of the proposed class, and there are no known conflicts of interest between Plaintiffs and members of the proposed class. Plaintiffs have retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

116. <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is

impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender.  Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.  The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties.  The issue in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

117.  <u>Public Policy Considerations</u>: Defendants violated the NMMWA.  Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment.

Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

118.    Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

## RULE 23 FMLA CLASS ACTION ALLEGATIONS

119.    Plaintiff Reynolds brings the Fourth Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all similarly situated employees, for relief to redress and remedy Defendants' violations of the FMLA, 29 U.S.C. § 2601, *et seq*.

120.    <u>Numerosity</u>:  The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.  While the exact number of class members is unknown to Plaintiff Reynolds at this time, upon information and belief, the class comprises at least hundreds of individuals nationwide.

121.    <u>Common Questions Predominate</u>: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendants' unlawful mandatory FMLA leave substitutions.  The common questions of law and fact include, but are not limited to, the following:

32

a.  Whether Defendants required that Financial Customer Associates, or those in similar positions, substitute unaccrued PTO for approved unpaid FMLA leave, when accrued PTO was not available;

b.  Whether Defendants' policy of mandating that Financial Customer Associates, or those in similar positions, take unaccrued PTO when no accrued PTO is available complies with the FMLA;

c.  Whether Defendants required Financial Customer Associates, or those in similar positions, to "earn" back unaccrued PTO used in place of approved FMLA leave; and

d.  Whether Financial Customer Associates, or those in similar positions, were required to pay Defendants back for such unaccrued PTO hours used in place of approved FMLA leave, when they terminated their employment; and

e.  Whether such charge backs of unaccrued PTO were in compliance with the FMLA requirements.

122.  <u>Typicality</u>: The claims of Plaintiff Reynolds herein are typical of the claims which could be alleged by any member of the class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions.  All putative class members were subject to the same FMLA practices of Defendants, as alleged herein, of mandating that employees use unaccrued PTO to substitute for approved FMLA leave, if accrued PTO was not available, and requiring employees pay Defendants back for such leave taken, if their employment terminated before they could earn it back.  Defendants'

33

practices affected all putative class members similarly, and Defendants benefited from the same type of unfair and/or unlawful acts as to each class member. Plaintiffs and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

123. <u>Adequacy of Representation</u>: Plaintiff Reynolds is able to fairly and adequately protect the interests of all members of the proposed class, and there are no known conflicts of interest between Plaintiff and members of the proposed class. Plaintiff has retained counsel who are experienced and competent in employment law and complex class action litigation.

124. <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class

action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties. The issue in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

125. <u>Public Policy Considerations</u>: Defendants violated the FMLA. Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

126. Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

**FIRST CAUSE OF ACTION**
**Violation of the Fair Labor Standards Act**
**29 U.S.C. § 201,** *et seq.*
**Brought by Plaintiffs on Behalf of Themselves and all Similarly Situated Employees**

127. Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

128.    At all relevant times, Defendants have been, and continue to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

129.    At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Plaintiffs, and each of the members of the prospective FLSA Class, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

130.    At all relevant times, Defendants have had gross operating revenues in excess of $500,000.

131.    The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendants, to compensate all non-exempt employees at the applicable minimum wage rate for all hours worked, and at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

132.    At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to pay for all hours worked to Plaintiffs, including for required, pre-shift work performed by Plaintiffs.

133.    At all relevant times, Defendants, pursuant to their policies and practices, failed to incorporate nondiscretionary bonuses, and compensation such as student loan reimbursements and fitness reimbursements, into Plaintiffs' hourly overtime rate, in violation of 29 C.F.R. §§ 778.208, 778.209(a).

134.    Defendants' failure to pay Plaintiffs for all hours worked, and at the appropriate overtime rate for hours worked in excess of forty (40) per week, despite the fact that, upon information and belief, Defendants knew of their obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b), since Defendants cannot show they acted in good faith, and a three (3) year, rather than two (2) year statute of limitations, since Defendants' acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a).

135.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of compensation for all required pre-shift hours worked, and appropriate compensation for all overtime hours worked, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
**Violation of the North Carolina Wage and Hour Act**
**N.C. Gen. Stat. § 95-25.1, *et seq*.**
**Brought by Plaintiff Reynolds on Behalf of Herself and all Similarly Situated Employees**

136.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

137.    At all relevant times, Defendants have employed, and/or continue to employ, Plaintiffs within the meaning of the NCWHA.

138.    Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and promised wages, on the employee's regular payday.

37

139. Defendants employed Plaintiff Reynolds, and similarly situated employees, within the State of North Carolina.

140. At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to pay Plaintiffs all owed, earned, and promised wages, including for required pre-shift work performed by Plaintiffs, and at the appropriate overtime rate that Plaintiffs are lawfully entitled to for hours worked in excess of forty (40) in a single workweek.

141. Consistent with the above, Defendants' failure to pay Plaintiffs all owed, earned, and promised wages was in violation of N.C. Gen. Stat. § 95-25.6.

142. As a result of Defendants' unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

143. Defendants' failure to pay Plaintiffs all owed, earned, and promised wages, despite the fact that, upon information and belief, Defendants knew of their obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

144. As a result of Defendants' unlawful acts, Plaintiffs have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.6, 95-25.22(a), (a1), and (d).

### THIRD CAUSE OF ACTION
**Violation of the New Mexico Minimum Wage Act**
**N.M. Stat. Ann. § 50-4-1, *et seq*.**

**Brought by Plaintiff Martinez on Behalf of Herself and all Similarly Situated Employees**

145.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

146.    At all relevant times, Defendants have employed, and/or continue to employ, Plaintiffs within the meaning of the NMMWA.

147.    Pursuant to the NMMWA, N.M. Stat. Ann. § 50-4-26(G), employers are liable to employees for all "unpaid or underpaid wages."

148.    Additionally, the NMMWA, pursuant to N.M. Stat. Ann. § 50-4-22, requires each covered employer, including Defendants, to compensate all non-exempt employees at the applicable minimum wage rate for all hours worked, and at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

149.    The NMMWA, N.M. Stat. Ann. § 50-4-26(D), explicitly enables employees to bring an action against employers "for and on behalf of the employee or employees and for other employees similarly situated . . . ."

150.    Defendants employed Plaintiff Martinez, and similarly situated employees, within New Mexico.

151.    At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to pay Plaintiffs wages due under the NMMWA, including for pre-shift work performed by Plaintiffs, and at the appropriate overtime rate that Plaintiffs are

lawfully entitled to for hours worked in excess of forty (40) in a single workweek.

152.    Consistent with the above, Defendants' failure to pay Plaintiffs all wages due under the law was in violation of the NMMWA.

153.    As a result of Defendants' unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

154.    Defendants' failure to pay Plaintiffs all due wages entitles Plaintiffs to "an additional amount equal to twice the unpaid or underpaid wages," under N.M. Stat. Ann. § 50-4-26(C).

155.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, interest, and attorneys' fees and costs, pursuant to N.M. Stat. Ann. § 50-4-26.

### FOURTH CAUSE OF ACTION
**Violation of the Family Medical Leave Act**
**29 U.S.C. § 2601, *et seq.***
**Brought by Plaintiff Reynolds on Behalf of Herself and all Similarly Situated Employees**

156.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

157.    At all relevant times, Defendants have been, and continue to be, an "employer" engaged in "commerce or in any industry or activity affecting commerce," which employs fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year, within the meaning of the FMLA, 29 U.S.C. § 2611(4).

40

158.    At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Plaintiffs, within the meaning of the FMLA, 29 U.S.C. § 2611(3).

159.    Among the stated purposes of the FMLA, under 29 U.S.C. § 2601(b)(1) and (2), are to "balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity," and "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."

160.    The FMLA, pursuant to § 2612(d)(2), permits each covered employer, including Defendants, to require an eligible employee, or allow an eligible employee to elect, "to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided under subparagraph (A), (B), (C), or (E) of subsection (a)(1) for any part of the 12-week period of such leave under such subsection."

161.    The FMLA, pursuant to 29 C.F.R. § 825.207(a), provides that if accrued paid leave is substituted, "the employee receives pay pursuant to the employer's applicable paid leave policy during the period of otherwise unpaid FMLA leave."

162.    Nothing in the text of the FMLA, or in the accompanying regulations, permits employers to require employees to substitute unaccrued paid leave for FMLA leave.

163.    At all relevant times, Defendants, pursuant to their policies and practices, required employees eligible for FMLA leave to substitute unaccrued PTO for FMLA leave

41

they were lawfully entitled to.

164. Under 29 U.S.C. § 2617(a)(1)(A)(iii), Defendants' failure to comply with the FMLA, despite the fact that, upon information and belief, Defendants knew of their obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the sum of amounts due under § 2617(a)(1)(A)(i) and (ii), since Defendants cannot show they acted in good faith, and a three (3) year, rather than two (2) year statute of limitations, since Defendants' acts constitute willful violations of the FMLA, within the meaning of § 2617(c)(2).

165. As a result of Defendants' unlawful acts, Plaintiffs are entitled to all wages, salary, benefits, or other compensation denied to or lost by such employees, any sums paid to Defendants to pay back unaccrued PTO taken in place of FMLA leave, or monetary losses sustained by employees as a result of Defendants' FMLA violation, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 2617.

## FIFTH CAUSE OF ACTION
### Violation of the Family Medical Leave Act
### 29 U.S.C. § 2601, *et seq.*
### Brought by Plaintiff Reynolds

166. Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

167. The FMLA, pursuant to 29 U.S.C. § 2615(a), prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [the FMLA]," or "discharge[ing] or in any other matter

42

discriminat[ing] against any individual for opposing any practice made unlawful by [the FMLA]."

168.    Plaintiff Reynolds, after receiving approval to take intermittent FMLA leave in February 2017, was discharged from her employment, after being told that her performance would improve if she stopped taking so much FMLA leave, and despite receiving performance awards and positive feedback throughout the course of her employment.

169.    Though Defendants cited poor performance for Plaintiff Reynolds' termination, the aforementioned circumstances provide reason to believe that such reviews were merely a pretext for terminating Plaintiff Reynolds.

170.    Shortly following her termination, Plaintiff Reynolds received a letter from Defendants stating that she owed them money for all sixty (60) hours of unaccrued PTO taken during her employment, but not yet "earned" back, including approximately forty (40) hours of which Defendants required her to take in place of her FMLA leave.

171.    Upon information and belief, Defendants terminated Plaintiff Reynolds' employment in retaliation of her taking intermittent FMLA leave, and/or in an effort to profit from the funds that Defendants stated Plaintiff Reynolds owed them, partially as a result of not yet "earning" all unaccrued PTO that Plaintiff Reynolds was required to substitute for approved FMLA leave.

172.    As a result of Defendants' unlawful retaliation in violation of the FMLA, Plaintiff Reynolds is entitled to all wages, salary, benefits, or other compensation denied

to or lost by her, including back pay and front pay, any monetary losses sustained by Plaintiff Reynolds as a result of Defendants' FMLA violation, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 2617.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs, and all those similarly situated, collectively pray that this Honorable Court:

1. Issue an Order certifying this action as a collective action under the FLSA, and designate Named Plaintiffs as representatives of all those similarly situated under the FLSA collective action;

2. At the earliest possible time, issue notice of this collective action, or allow Named Plaintiffs to do so, to all persons who were, are, or will be employed by Defendants nationwide as Financial Customer Associates, or in similar positions, at any time within the three (3) years prior to the date of commencement of this action through the date of judgment or final disposition in this action, and who did not receive compensation for all required, pre-shift work, and who did not receive all overtime compensation due for hours worked in excess of forty (40) per week. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

3. Issue an Order certifying this action as a class action under the NCWHA, and designate Plaintiff Reynolds as a representative on behalf of all those similarly situated under the NCWHA class and designate the below signed counsel as class counsel;

44

4.      Issue an Order certifying this action as a class action under the NMMWA, and designate Plaintiff Martinez as a representative on behalf of all those similarly situated under the NMMWA class and designate the below signed counsel as class counsel;

5.      Award Plaintiffs actual damages for unpaid wages and liquidated damages equal in amount for the unpaid compensation found due to Plaintiffs and the class as provided by the FLSA, 29 U.S.C. § 216(b); award Plaintiff Reynolds and employees in the North Carolina class actual damages for unpaid wages and liquidated damages equal in amount as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (a1); and award Plaintiff Martinez and employees in the New Mexico class actual damages for unpaid wages and liquidated damages equal in amount as provided by the NMMWA, N.M. Stat. Ann. § 50-4-26;

6.      Award Plaintiffs attorneys' fees, costs, and interest pursuant to the FLSA, U.S.C. § 216(b), pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (d), and pursuant to the NMMWA, N.M. Stat. Ann. § 50-4-26;

7.      Issue an Order certifying this action as a class action under the FMLA, and designate Plaintiff Reynolds as a representative on behalf of all those similarly situated under the FMLA class and designate the below signed counsel as class counsel;

8.      Award Plaintiffs all wages, salary, benefits, or other compensation denied to or lost by such employees, any sums paid to Defendants to pay back unaccrued PTO taken in place of FMLA leave, or monetary losses sustained by employees as a result of

Defendants' FMLA violation, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 2617;

9.     Award Plaintiff Reynolds all wages, salary, benefits, or other compensation denied to or lost by her, including back pay and front pay, any monetary losses sustained by Plaintiff Reynolds as a result of Defendants' retaliation in violation of the FMLA, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 2617; and

10.     Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this May 17, 2018

*/s/ Gilda A. Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com

Christine E. Webber (#439368) *pro hac vice anticipated*
**COHEN MILSTEIN SELLERS & TOLL, PLLC**

46

1100 New York Avenue, Suite 500 West
Washington, DC 20005
cwebber@cohenmilstein.com
Telephone: 202.408.4600
Facsimile: 202.408.4699

*Attorneys for Plaintiffs*

47