| | | |
|---|---|---|
| BAILEY REYNOLDS and HELEN MARTINEZ on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) ) | **PLAINTIFFS' FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT** |
| FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC., FMR LLC, FIDELITY BROKERAGE SERVICES LLC, and FIDELITY WORKPLACE INVESTING LLC, | ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

Plaintiffs Bailey Reynolds and Helen Martinez (collectively "Named Plaintiffs"), by and through counsel, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), hereby set forth this collective and class action against Defendants Fidelity Investments Institutional Operations Company, Inc. ("FIIOC"), FMR LLC ("FMR"), Fidelity Brokerage Services LLC ("FBS"), and Fidelity Workplace Investing LLC ("FWI") (collectively "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1.     This action arises out of Defendants' systemic, company-wide failure to compensate Plaintiffs for all hours worked, and for overtime hours worked at the appropriate overtime rate, in violation of the Fair Labor Standards Act ("FLSA"), 29

1

U.S.C. § 201, *et seq.*, the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq.*, and the New Mexico Minimum Wage Act ("NMMWA"), N.M. Stat. Ann. § 50-4-1, *et seq.*

2.     Plaintiffs consist of current and former Financial Customer Associates, or similar positions, who are compensated on an hourly basis.  Throughout the relevant period, Defendants have maintained a corporate policy of failing to compensate Plaintiffs for all mandatory pre-shift work.  In particular, Defendants required Plaintiffs to arrive at work prior to their scheduled shift in order to perform a litany of tasks necessary to perform their jobs, including booting up computers, running several software programs, checking daily bulletins, reviewing call schedules, checking emails, checking callbacks, and organizing their desks.  Plaintiffs only received compensation after this work had been completed, though they were required to perform this work in order to be prepared to answer phone calls when their scheduled shifts began.  This work was required to be completed to be "call ready."  Failure to be "call ready," or prepared to answer phone calls when their scheduled shifts began, could result in warnings, discipline, and ultimately, termination.

3.     Defendants, through their managers, were aware that Plaintiffs were completing this pre-shift work, and doing so without compensation.  Defendants suffered or permitted, and in fact required Plaintiffs to complete such pre-shift work.

4.     Plaintiffs routinely worked 40 hours or more per week, without accounting for pre-shift work.  When pre-shift work is included, even those Plaintiffs who were

scheduled and paid for only 40 hours per week, actually worked over 40 hours per week without being compensated for the pre-shift work or compensated at the overtime rate for hours worked over 40 per week.

5. Throughout the relevant period, Defendants have also maintained a corporate policy of underpaying and failing to lawfully compensate Plaintiffs at the appropriate overtime rates. Defendants issued quarterly "bonuses" to Plaintiffs, based on objective, nondiscretionary metrics, including length of employment, customer survey ratings, schedule adherence, and idle/RAP time. Defendants, however, failed to take into account such nondiscretionary bonuses during overtime workweeks when calculating Plaintiffs' regular and overtime rates. Similarly, Defendant provided additional compensation to Plaintiffs through student loan reimbursements and fitness reimbursements but failed to take that compensation into account when calculating Plaintiffs' regular and overtime rates, and thus failed to pay overtime at the correct rate.

6. Defendants' practices of failing to compensate Plaintiffs for all pre-shift work and failing to compensate Plaintiffs at the appropriate overtime rate for overtime hours worked, violated Plaintiffs' rights under the FLSA, NCWHA, and NMMWA.

7. Plaintiffs bring this action for violation of the FLSA as a collective action, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the following class nationwide:

> All individuals who were, are, or will be employed by Defendants as Financial Customer Associates, or in similar positions, at any time within the past three (3) years prior to the date of commencement of this action, through

3

the through the date of judgment or final disposition in this action, and who were subject to Defendants' pre-shift work policy and who worked forty (40) or more hours in at least one workweek in which pre-shift work was performed, and/or who were paid quarterly bonuses, including but not limited to, those identified as "Bonus Eligible" and/or "Pr Yr Bon ELI" compensation pursuant to a Compensation Plan and worked overtime during any pay period for which a bonus was received, and/or who received student loan repayments pursuant to Defendants' student loan repayment program and worked overtime during any pay period in which Defendants made student loan repayments, and/or who received fitness reimbursements from Defendants and worked overtime during any pay period in which fitness reimbursements were made.

8.    Defendants are liable for their failure to pay Plaintiffs for all work performed, and at the appropriate overtime rate for hours worked in excess of forty (40) per week.

9.    Plaintiffs who elect to participate in this FLSA collective action seek compensation for all pre-shift work performed for Defendants, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

10.    Plaintiff Bailey Reynolds ("Plaintiff Reynolds") also brings this action, on her own behalf, and as a representative of similarly situated current, former or future Financial Customer Associates, or similar positions, employed by Defendants in North Carolina, under the NCWHA.  Plaintiff Reynolds, who is a North Carolina resident and who worked for Defendants in North Carolina, asserts that she and the putative class, who work or worked in North Carolina for Defendants, are entitled to compensation for all pre-shift work performed for Defendants whether the work week totaled greater or fewer than

4

than forty (40) hours, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.6, 95-25.22(a), (a1), and (d).

11.     Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendants' employees in North Carolina:

> All individuals who were, are, or will be employed by Defendants in North Carolina as Financial Customer Associates, or in similar positions, at any time within the past two (2) years prior to the date of commencement of this action, through the date of judgment or final disposition in this action, and who were subject to Defendants' pre-shift work policy, and/or who were paid quarterly bonus compensation, including but not limited to, those identified as "Bonus Eligible" and/or "Pr Yr Bon ELI" pursuant to a Compensation Plan and worked overtime during any pay period for which a bonus was received, and/or who received student loan repayments pursuant to Defendants' student loan repayment program and worked overtime during any pay period in which Defendants made student loan repayments, and/or who received fitness reimbursements from Defendants and worked overtime during any pay period in which fitness reimbursements were made.

12.     Helen Martinez ("Plaintiff Martinez") also brings this action, on her own behalf, and as a representative of similarly situated current, former or future Financial Customer Associates, or similar positions, employed by Defendants in New Mexico, under the NMMWA.  Plaintiff Martinez, who is a New Mexico resident and who worked for Defendants in New Mexico, asserts that she and the putative class, who work or worked in New Mexico for Defendants, are entitled to compensation for all pre-shift work performed for Defendants, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, interest, and

5

attorneys' fees and costs, pursuant to N.M. Stat. Ann. §§ 50-5-2, 50-4-15, 50-4-22(D), 50-4-26(C), (D), (E), and (G).

13.     Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendants' employees in New Mexico:

> All individuals who were, are, or will be employed by Defendants in New Mexico as Financial Customer Associates, or in similar positions, at any time within the past two (2) years prior to the date of commencement of this action, through the date of judgment or final disposition in this action, and who were subject to Defendants' pre-shift work policy and who worked forty (40) or more hours in at least one workweek in which pre-shift work was performed, and/or who were paid quarterly bonus compensation, including but not limited to, those identified as "Bonus Eligible" and/or "Pr Yr Bon ELI" pursuant to a Compensation Plan and worked overtime during any pay period for which a bonus was received, and/or who received student loan repayments pursuant to Defendants' student loan repayment program and worked overtime during any pay period in which Defendants made student loan repayments, and/or who received fitness reimbursements from Defendants and worked overtime during any pay period in which fitness reimbursements were made.

## JURISDICTION AND VENUE

14.     The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based upon the claims brought under the FLSA, 29 U.S.C. § 201, *et seq.*, and the FMLA, 29 U.S.C. § 2601, *et seq.*

15.     Independently, the Court has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332, because there exists diversity of citizenship for purposes of CAFA, and because there are over 100 putative class members in each of the state-law classes, and the total amount in controversy for each state-law class exceeds $5 million.  Such diversity exists as at least one member of each putative class is

6

a citizen of a state other than the states of Defendants' citizenship.

16.     Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the NCWHA and NMMWA because those state law claims arise out of the same nucleus of operative fact as the FLSA claims.

17.     The United States District Court for the Middle District of North Carolina has personal jurisdiction because Defendants conduct business in Durham County, North Carolina, which is located within this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business and can be found within the Middle District of North Carolina, and the substantial part of the events or omissions giving rise to these claims occurred in this District.

19.     All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

## PARTIES

20.     Plaintiff Reynolds is an adult resident of North Carolina, residing at 3939 Glenwood Ave., #354, Raleigh, North Carolina 27612.   She worked as a Financial Customer Associate for Defendants at their Durham, North Carolina location from approximately November 2015, until May 16, 2017.   Her scheduled shift was typically 8:30 a.m. through 5:00 p.m., Monday through Friday.   She received paychecks and tax documents from Defendants FIIOC and FWI.

7

21.     Helen Martinez is an adult resident of New Mexico, residing at 7621 San Benito Street NW, Albuquerque, NM 87120.   She worked as a Financial Customer Associate for Defendants at their Albuquerque, New Mexico location from approximately September 2013, until October 2016.    Her scheduled shift was typically 6:30 a.m. to 3:00 p.m., Monday through Friday.   She received paychecks and tax documents from Defendants FIIOC and FBS.

22.     Defendant Fidelity Investments Institutional Operations Company, Inc. is a wholly-owned subsidiary of FMR LLC, is incorporated in Massachusetts, and has its principal place of business located at 245 Summer Street, ZW9A, Boston, MA 02210.

23.     Defendant FMR LLC is a privately-held multinational financial services firm organized under Delaware law and headquartered in Massachusetts and has its principal place of business located at 245 Summer Street, ZW9A, Boston, MA 02210.

24.     Defendant Fidelity Brokerage Services LLC is a wholly-owned subsidiary of FMR LLC, is organized under Delaware law and headquartered in Massachusetts, and has its principal place of business located at 245 Summer Street, ZW9A, Boston, MA 02210.

25.     Defendant Fidelity Workplace Investing LLC is a wholly-owned subsidiary of FMR LLC is organized under Delaware law and headquartered in Massachusetts and has its principal place of business located at 245 Summer Street, ZW9A, Boston, MA 02210.

26.     According to their website, Defendants provide financial planning and retirement options such as IRAs, annuities, and managed accounts; brokerage and case

8

management products; college savings accounts; and other financial services for millions of individual investors. Defendants also work with employers to build benefit programs and provide recordkeeping, investments, and administrative services for employer offerings; and provide investment products, brokerage, and trading services to financial firms.

27. Among other things, Fidelity has more than $6,000,000,000,000 (six trillion) in assets under management.

28. According to their website, at all relevant times, Defendants employ more than 40,000 (forty thousand) employees, thousands of them on an hourly basis all over the United States.

29. At all relevant times, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d), the FMLA, 29 U.S.C. § 2611(4), the NCWHA, N.C. Gen. Stat. § 95-25.2(5), the NMMWA, N.M. Stat. Ann. § 50-4-21(B).

30. At all relevant times, Defendants acted as joint employers with respect to the operation of the call centers, as defined in *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017) and as set forth below at ¶¶ 83-95.

31. At all relevant times, Defendants operated as an enterprise within the meaning of 29 U.S.C. § 203(r)(1).

32. At all relevant times, Plaintiffs were employees engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207.

33. At all relevant times, Defendants have had gross operating revenues in excess

9

of $500,000, consistent with 29 U.S.C. § 203(s)(1)(A)(ii).

## FACTUAL ALLEGATIONS

34.     According to their website, Defendants employ more than 40,000 associates, with several thousand employed as Financial Customer Associates, or in similar positions, throughout the entire United States, in over 190 investor centers.

35.     Defendants employ Financial Customer Associates, or similar positions, to work in call centers and communicate with current and prospective customers to help navigate various issues with which they may require assistance, including, but not limited to, 401(k) issues, pension issues, mutual funds issues, and issues related to other financial and investment vehicles that Defendants offer.

36.     Defendants compensate Financial Customer Associates, or similar positions, on an hourly basis.  Defendants classify these employees as non-exempt under the FLSA.

37.     Plaintiff Reynolds and Plaintiff Martinez worked for Defendants as Financial Customer Associates, or in similar positions, during the relevant period.

### A.  Unpaid and Required Pre-Shift Work

38.     Defendants require Financial Customer Associates to work scheduled shifts, typically eight and one-half (8.5) hour shifts, five (5) days per week, with a thirty (30) minute unpaid lunch break each day.  However, at some of Defendants' call center locations, Financial Customer Associates are required to work between 50 and 60 hours per week.

39.     During the relevant period, Defendants utilized two distinct company

10

policies regarding compensation for required pre-shift work.

40.     Defendants' first policy (hereinafter "Policy One"), in place from at least the beginning of the relevant period, until approximately July 2016, compensated Financial Customer Associates for six (6) minutes of required pre-shift work each day, regardless of the amount of time required to perform such pre-shift work.

41.     Although Policy One compensated Financial Customer Associates for six (6) minutes of required pre-shift work each day, Financial Customer Associates typically performed approximately ten (10) to fifteen (15) minutes of pre-shift work during this period, including manually booting up computers, launching software programs (including Focus Point, a program providing access to customer accounts; Genesys or other time-tracker programs; FPRS, a mainframe database; internal webpages; and separate programs specific to certain financial products), checking daily bulletins, reviewing the call schedule, checking emails, checking callbacks, and organizing desks.  Because these duties had to be performed and programs launched by Financial Customer Associates before their time would be automatically recorded by the time-tracker program (which transferred data to a program called Artic), their time engaged in such activities was not properly captured or compensated.

42.     This required, pre-shift work performed under Policy One had to be performed before the beginning of each shift in order for Financial Customer Associates to be "call ready," or prepared to answer calls, at the beginning of their scheduled shifts.

43.     Defendants mandated that Financial Customer Associates be "call ready"

11

when their scheduled shifts began, necessitating the aforementioned required pre-shift work under Policy One.

44.     If Financial Customer Associates were not "call ready" when their scheduled shifts began, they risked receiving "tardies" on their records. Multiple "tardies" could result in formal warnings, disciplinary action, or termination from employment.

45.     If Financial Customer Associates arrived immediately prior to the beginning of their scheduled shifts, they could not feasibly be able to perform all required pre-shift work necessary to be "call ready" when their scheduled shifts began, and they would therefore receive "tardies" on their records. They also would not be compensated for any work until they were "call ready."

46.     Under Policy One, from the beginning of the relevant period until approximately January 2016, Financial Customer Associates were able to log into the time-tracker program at any time, but they were required to retroactively remove all but six (6) minutes of pre-shift work from such records, and only the six minutes would be compensated. From approximately January 2016 until July 2016, still while under Policy One, Financial Customer Associates were expressly instructed not to log into the time-tracker program more than six (6) minutes before the beginning of their scheduled shifts. Thus, they were limited to recording in the time-tracker program only the six (6) minutes of pre-shift time provided for by Policy One; they were effectively inhibited from reporting the remainder of the required pre-shift work performed before the start of their shift, and Defendants employed a company-wide policy of not compensating for such required pre-

12

shift work.  Managers who found pre-shift work included on an employee's timesheet, would remove it, or instruct employees to remove it, pursuant to company policy.  Artic, which reflects time recorded in the time-tracker program, makes it possible to view what time was retroactively added or removed from an employee's time records.

47.     Defendants' second policy (hereinafter "Policy Two"), in place from approximately July 2016 until at least late 2017, ceased the practice of compensating Financial Customer Associates for six (6) minutes of required pre-shift work each day, and did not compensate Financial Customer Associates for *any* work performed before the beginning of their scheduled shifts, and prior to their "call ready" status.

48.     When Policy Two was enacted, Defendants no longer required that Financial Customer Associates manually boot up their computers.  Instead, computers were booted up, and prepared with necessary login information, automatically.  This change reduced the amount of pre-shift work required by Financial Customer Associates each day.  However, Financial Customer Associates were still required to perform approximately five (5) minutes of pre-shift work each day, including launching all software programs (including Focus Point, Genesys or other time-tracker programs, a mainframe database, internal webpages, and separate databases), checking daily bulletins, reviewing the call schedule, checking emails, checking callbacks, and organizing desks.

49.     This required pre-shift work performed under Policy Two had to be performed prior to the beginning of each shift in order for Financial Customer Associates to be "call ready," or prepared to answer calls, at the beginning of their scheduled shifts.

13

50.     Defendants mandated that Financial Customer Associates be "call ready" when their scheduled shifts began, necessitating the required pre-shift work under Policy Two.

51.     If Financial Customer Associates were not "call ready" when their scheduled shifts began, they risked receiving "tardies" on their records.  Multiple "tardies" could result in formal warnings, disciplinary action, or termination from employment.

52.     If Financial Customer Associates arrived immediately prior to the beginning of their scheduled shifts, they could not feasibly perform all pre-shift work necessary during Policy Two to be "call ready" when their scheduled shifts began, and they would therefore receive "tardies" on their records.  They also would not be compensated for any work until they were "call ready."

53.     Under Policy Two, although Financial Customer Associates could manually enter start-up time on a timesheet, Financial Customer Associates were instructed not to enter such time manually and not to log into the time-tracker program until one (1) minute prior to the start of their scheduled shift, at which point they would enter "Ready" status. Therefore, Financial Customer Associates were typically not compensated for any pre-shift work performed during Policy Two, as Defendants employed a company-wide policy of not compensating for such pre-shift work.  Managers who found pre-shift work included on an employee's timesheet, would remove it, or instruct employees to remove it, pursuant to company policy.

54.     Because most Financial Customer Associates worked scheduled shifts of at

14

least forty (40) hours per week, this required pre-shift work was nearly always overtime work, compensable at one and one-half (1.5) times the regular rate.

55. Plaintiff Reynolds typically worked approximately ten (10) to fifteen (15) minutes of pre-shift work under Policy One, and five (5) minutes of pre-shift work under Policy Two, though she was not compensated for all such time worked. For example, from approximately November 2015 to July 2016, during Policy One, Plaintiff Reynolds worked an average of ten (10) minutes per day for pre-shift work activities. During Policy One, Plaintiff Reynolds worked approximately 40.83 hours per week, including pre-shift work during at least one workweek, but was only compensated for forty 40.5 hours of work; and from July 2016 to the date of termination, during Policy Two, Plaintiff Reynolds worked 40.42 hours, including pre-shift work, but was only compensated for forty (40) hours of work. In the aggregate, during her entire period of employment, Plaintiff Reynolds was not paid a minimum of $799.31 for unpaid pre-shift work.

56. Plaintiff Martinez typically worked approximately ten (10) to fifteen (15) minutes of required pre-shift work during Policy One, and five (5) minutes of pre-shift work during Policy Two, though she was not compensated for all such time worked. For example, from approximately September 2013 to July 2016 during Policy One, Plaintiff Martinez worked an average of 12.5 minutes per day for pre-shift work activities. During Policy One, Plaintiff Martinez worked approximately 58.54 hours per week during peak season and 52.04 hours per week outside of peak season, including pre-shift work during at least one workweek, but was only compensated for 57.5 or 51 hours of work respectively.

15

From July 2016 to October 2016, during Policy Two, Plaintiff Martinez worked approximately 51.5 hours, including pre-shift work, but was only compensated for fifty (50) hours of work. In the aggregate, for just one year, Plaintiff Martinez was not paid a minimum of $810.49 for unpaid pre-shift work.

57.     Defendants' failure to compensate for all pre-shift work performed has affected all Plaintiffs similarly.

### B. Unpaid Overtime – Nondiscretionary Bonuses

58.     All or most Financial Customer Associates were scheduled for and worked at least a full forty (40) hours per week, not including the required pre-shift work described above. Even those scheduled for 40 hours occasionally worked longer, such as when phone calls with customers did not end prior to the conclusion of their scheduled shifts. In some locations and time periods, Financial Customer Associates typically were scheduled for and worked fifty (50) to sixty (60) hours per week, not including the required pre-shift work described above.

59.     Financial Customer Associates were compensated at one and one-half (1.5) times their regular hourly rate for all hours Defendants counted as work in excess of forty (40) each week, but not for the uncompensated required pre-shift work described above.

60.     Throughout the relevant period, Defendants have issued, as part of their compensation, at least two types of quarterly bonuses to Financial Customer Associates, which are identified on wage statements as "Bonus Eligible" and "Pr Yr Bon ELI."

61.     Defendants' quarterly bonuses were nondiscretionary, and were based on

16

objective metrics, including length of employment, customer survey ratings, schedule adherence, and idle/RAP time, pursuant to a formula established by Defendants.

62. Defendants determined the amount of each employee's bonus by allocating a set dollar amount to each team of employees depending on the team's productivity. Managers then distributed the total amount among the members of the team depending on each employee's metrics. These bonuses were a fixed dollar amount not awarded as a percentage of each employee's total earnings.

63. Although Defendants' quarterly bonuses were part of Financial Customer Associates' compensation, such bonuses were not discretionary, and were based on objective metrics. Despite such objective metrics and the fact that the bonuses were calculated as a fixed dollar amount, Defendants did not take into account such nondiscretionary bonuses when calculating Financial Customer Associates' regular and overtime rates.

64. Accordingly, the overtime rates paid by Defendants did not vary regardless of the sum of Financial Customer Associates' regular earnings, nondiscretionary bonuses and other incentive payments, and regardless of the extent to which the nondiscretionary bonuses would have increased the regular hourly rates.

65. Plaintiff Reynolds typically received between $150 and $1,000 in quarterly bonuses, and occasionally worked hours in excess of forty (40) per week (exclusive of the pre-shift work described above), but only received overtime at a rate of one and one-half (1.5) times her ordinary hourly rate for all hours worked in excess of forty (40) each week,

17

which did not incorporate the amount of the nondiscretionary bonuses.  For example, during at least one week when a quarterly bonus was given to Plaintiff Reynolds, Plaintiff Reynolds worked hours in excess of forty (40) per week, but she only received overtime at a rate of one and one-half (1.5) times her ordinary hourly rate, despite the fact that she received a nondiscretionary bonus, which was on average approximately $700 per quarter, and which should have been incorporated in determining Plaintiff Reynolds' regular rate for any overtime worked during any workweek in any given quarter.

66.     Plaintiff Martinez typically received around $1200.00 in quarterly bonuses, and regularly worked hours in excess of forty (40) per week (exclusive of the pre-shift work described above), but only received overtime at a rate of one and one-half (1.5) times her ordinary hourly rate for all hours worked in excess of forty (40) each week, which did not incorporate the amount of the nondiscretionary bonuses.  For example, during at least one week when a quarterly bonus was given to Plaintiff Martinez, Plaintiff Martinez worked hours in excess of forty (40) per week, but she only received overtime at a rate of one and one-half (1.5) times her ordinary hourly rate, despite the fact that she received a nondiscretionary bonus, which was on average approximately $1200 per quarter, and which should have been incorporated in determining Plaintiff Martinez's regular rate for any overtime worked during any workweek in any given quarter.

67.     Defendants' failure to compensate at the appropriate rate for overtime work performed has affected all Plaintiffs similarly.

C. Unpaid Overtime – Student Loan Program

68.     Throughout the relevant period, Defendants have issued, as part of their compensation to Financial Customer Associates, Student Loan Reimbursements. Defendants pay up to $2000 a year towards each employee's student loans.  In order to be eligible for this program, Financial Customer Associates must work for Defendants for more than six (6) months, must work more than twenty (20) hours a week, and must have satisfactory work performance.  According to Defendants' website, more than 5,000 of its employees participate in this program.

69.     Plaintiff Reynolds was eligible for this program and participated in it. Defendants paid approximately $150.00 towards Plaintiff Reynold's student loans every month.  The entire amount of these monthly payments was imputed to Plaintiff Reynolds as wages on her wage statements.

70.     Defendants do not include student loan repayments in calculating the regular rate of pay for overtime purposes for its non-exempt employees.  In this way, Defendants reduce the cost of overtime in violation of federal and state wage and hour laws.

**D. Unpaid Overtime – Fitness Reimbursements**

71.     Another form of compensation that Defendants pay to its Financial Customer Associates relates to "fitness reimbursements" pursuant to its "Fitness Reimbursement Program."  Under this program, Defendants will "reimburse" employees 50% of what they spend, with a cap of $300 a year, for things such as their own or their spouse's gym membership, home exercise equipment, or Fitbit watches.

19

72.     In order to be eligible for the Fitness Reimbursement program, employees must work for Defendants for more than six months and must work more than 20 hours a week.  They will only receive the reimbursement if they are actively working.

73.     Plaintiff Reynolds was eligible for this program and participated in it.  She received "fitness reimbursements" from Defendants in 2016.  The entire amount of this fitness reimbursement was imputed to Plaintiff Reynolds as wages on her wage statements.

74.     Defendants do not include fitness reimbursements in calculating the regular rate of pay Financial Customer Associates receive for overtime purposes.  In this way, Defendants reduce the cost of overtime in violation of federal and state wage and hour laws.

## G. Unlawful Retaliation Against Plaintiff Reynolds

75.     Throughout the course of her employment, Plaintiff Reynolds consistently received praise and positive feedback from her supervisors.

76.     In July 2016, Plaintiff Reynolds won an award for being "Team MVP."

77.     Plaintiff Reynolds received Defendants' approval to take intermittent leave pursuant to the FMLA in approximately February 2017.

78.     In April 2017, Plaintiff Reynolds won an award for receiving 100% positive feedback on customer service, for which she received a gift card.

79.     Plaintiff Reynolds was informed, on at least one occasion, that her performance would improve if she stopped taking so much FMLA leave.

80.     Plaintiff Reynolds received negative feedback in or around May 2017, just one month after receiving a performance award, and just prior to her termination, seemingly as a pretext for her termination.

81.     On May 16, 2017, Plaintiff Reynolds was terminated from her employment. Defendants cited poor performance for her termination.

82.     Upon information and belief, Defendants terminated Plaintiff Reynolds' employment in retaliation of her taking intermittent FMLA leave.

## SINGLE ENTERPRISE AND JOINT EMPLOYMENT ALLEGATIONS

83.     Defendants FIIOC, FBS and FWI are wholly-owned subsidiaries of FMR LLC, which is described on the company's website as the parent company of various Fidelity entities.

84.     Upon information and belief, all four Defendants jointly operate Fidelity's call centers and own or control their premises.

85.     Upon information and belief, all four Defendants have the power to direct, control, supervise, hire, fire, and set the terms of employment for Financial Customer Associates and other call center employees.

86.     All four Defendants pay Financial Customer Associates and other call center employees, and it is not uncommon for Financial Customer Associates to receive tax information from more than one Defendant in the same year, without transferring work locations or being informed that the employer has changed.

87. Defendant FMR LLC provides computer systems for call center employees, and "FMR" is the business name used in employees' email addresses, including employees not paid by FMR.

88. Plaintiff Reynolds received paychecks and tax documents from Defendants FIIOC and FWI in 2016. During that period, Plaintiff Reynolds continued to work in the same location and did not believe that she had changed jobs or employers.

89. Plaintiff Martinez received paychecks and tax documents from Defendants FIIOC and FBS in 2016. During that period, Plaintiff Martinez continued to work in the same location and did not believe that she had changed jobs or employers.

90. Upon information and belief, different Fidelity products are the responsibility of different entities. For instance, FIIOC is responsible for 401(k)s, while FBS is responsible for IRAs and FMR is responsible for health insurance benefits. Financial Customer Associates who are trained to answer questions regarding multiple financial products are therefore employed by multiple Fidelity entities at the same time, and may answer questions about products offered by multiple entities during the same work day.

91. As a result, employees working alongside one another in the call centers were paid by all four Defendants, depending on the types of questions they answered.

92. Defendants do not distinguish between Fidelity entities within the call centers, such that employees are either unaware of any distinctions among them, or view all Defendants as different departments of one company.

22

93.     All Defendants operate the call centers for a common business purpose, and the call centers handle the customer service needs of all three Defendants.

94.     All Defendants are named as Fidelity companies on Defendants' website.

95.     All Defendants share corporate officers and a primary business address.

## FLSA COLLECTIVE ACTION ALLEGATIONS

96.     Plaintiffs bring the First Cause of Action of the instant Complaint as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of themselves and all similarly situated employees.

97.     Members of the FLSA class are similarly situated.

98.     Members of the FLSA class have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that fail to compensate them for all work performed and fail to compensate them at the appropriate overtime rate for all hours worked in excess of forty (40) per week.

99.     There are numerous (in excess of 10,000) similarly situated current and former Financial Customer Associates that fall within the scope of the aforementioned FLSA class.

100.    These similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

101.    Members of the proposed FLSA class, therefore, should be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

102.    Pursuit of this action collectively will provide the most efficient mechanism

23

for adjudicating the claims of Plaintiffs.

103. Named Plaintiffs consent in writing to assert their claims for unpaid wages under the FLSA pursuant to 29 U.S.C. § 216(b). Named Plaintiffs' signed consent forms are filed with the Court as Exhibits A through B to this Complaint. As this case proceeds, it is likely other individuals will file consent forms and join as opt-in plaintiffs.

104. Plaintiff Reynolds and Plaintiff Martinez request that they be permitted to serve as representatives of those who consent to participate in this action, and that this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## RULE 23 NCWHA CLASS ACTION ALLEGATIONS

105. Plaintiff Reynolds brings the Second Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all similarly situated employees, for relief to redress and remedy Defendants' violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, et seq.

106. Numerosity: The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiff Reynolds at this time, upon information and belief, the class comprises at least 1,800 individuals.

107. Common Questions Predominate: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting

24

members of the proposed class individually, in that all putative class members have been harmed by Defendants' failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

    a. Whether pre-shift work performed by putative NC Class Members is compensable under the NCWHA;

    b. Whether Defendants' failure to compensate putative NC Class Members for pre-shift work is in violation of the NCWHA;

    c. Whether Defendants failed to compensate putative NC Class Members at the earned, accrued, and/or promised rate for all hours worked in excess of forty (40) each week; and

    d. Whether Defendants failed to compensate putative NC Class Members for all of their earned, accrued, and/or promised wages, including, but not limited to, straight time and overtime on their regular pay date, in violation of the NCWHA.

108. <u>Typicality</u>: The claims of Plaintiff Reynolds are typical of the claims which could be alleged by any member of the putative NC Class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendants, as alleged herein, of failing to pay employees for all pre-shift work, and for hours worked in excess of forty (40) each week at the appropriate hourly rate. Defendants' compensation

25

policies and practices affected all putative NC class members similarly, and Defendants benefited from the same type of unfair and/or unlawful acts as to each putative NC class member. Plaintiff and members of the proposed NC class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

109. <u>Adequacy of Representation</u>: Plaintiff Reynolds is able to fairly and adequately protect the interests of all members of the proposed NC class, and there are no known conflicts of interest between Plaintiff Reynolds and members of the proposed class. Plaintiff has retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

110. <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class

action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties. The issue in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

111. Public Policy Considerations: Defendants violated the NCWHA. Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

112. Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

## RULE 23 NMMWA CLASS ACTION ALLEGATIONS

113. Plaintiff Martinez brings the Third Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all similarly situated employees, for relief to redress and remedy

27

Defendants' violations of the NMMWA, N.M. Stat. Ann. § 50-4-1, *et seq*.

114.    <u>Numerosity</u>:  The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.  While the exact number of class members is unknown to Plaintiff Martinez at this time, upon information and belief, the class comprises at least 1,000 individuals.

115.    <u>Common Questions Predominate</u>: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendants' failure to lawfully compensate them.  The common questions of law and fact include, but are not limited to, the following:

    a.  Whether pre-shift work performed by putative NM Class Members is compensable under the NMMWA;

    b.  Whether Defendants' failure to compensate putative NM Class Members for pre-shift work is in violation of the NMMWA;

    c.  Whether Defendants failed to compensate putative NM Class Members at the appropriate hourly rate for all hours worked in excess of forty (40) each week;

    d.  Whether Defendants' failure to compensate putative NM Class Members at the appropriate hourly rate for all hours worked in excess of forty (40) each

28

week is in violation of the NMMWA; and

e. Whether Defendants failed to compensate putative NM Class Members for all of their earned, accrued, and/or promised wages, including, but not limited to, straight time and overtime on their regular pay date, in violation of the NMMWA.

116. <u>Typicality</u>: The claims of Plaintiffs herein are typical of the claims which could be alleged by any member of the class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendants, as alleged herein, of failing to pay employees for all required pre-shift work, and for hours worked in excess of forty (40) each week at the appropriate hourly rate. Defendants' compensation policies and practices affected all putative class members similarly, and Defendants benefited from the same type of unfair and/or unlawful acts as to each class member. Plaintiffs and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

117. <u>Adequacy of Representation</u>: Plaintiffs are able to fairly and adequately protect the interests of all members of the proposed class, and there are no known conflicts of interest between Plaintiffs and members of the proposed class. Plaintiffs have retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

118.  Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all class members is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender.  Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.  The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class action.  Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties.  The issue in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

119.  Public Policy Considerations: Defendants violated the NMMWA.  Just as current employees are often afraid to assert their rights out of fear of direct or indirect

30

retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

120.    Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

## FIRST CAUSE OF ACTION
### Violation of the Fair Labor Standards Act
### 29 U.S.C. § 201, *et seq.*
### Brought by Plaintiffs on Behalf of Themselves and all Similarly Situated Employees

121.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

122.    At all relevant times, Defendants have been, and continue to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

123.    At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Plaintiffs, and each of the members of the prospective FLSA Class, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

124.    At all relevant times, Defendants have had gross operating revenues in excess

31

of $500,000.

125.    The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendants, to compensate all non-exempt employees at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

126.    At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to pay for all hours worked to Plaintiffs, including for required, pre-shift work performed by Plaintiffs.

127.    At all relevant times, Defendants, pursuant to their policies and practices, failed to incorporate nondiscretionary bonuses, and compensation such as student loan reimbursements and fitness reimbursements, into Plaintiffs' hourly overtime rate, in violation of 29 C.F.R. §§ 778.208, 778.209(a).

128.    Defendants' failure to pay Plaintiffs for all hours worked, and at the appropriate overtime rate for hours worked in excess of forty (40) per week, in weeks where Plaintiffs worked over 40 hours, despite the fact that, upon information and belief, Defendants knew of their obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b), since Defendants cannot show they acted in good faith, and a three (3) year, rather than two (2) year statute of limitations, since Defendants' acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a).

129.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of

compensation for all required pre-shift hours worked, and appropriate compensation for all overtime hours worked, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**Violation of the North Carolina Wage and Hour Act**
**N.C. Gen. Stat. § 95-25.1, *et seq*.**
**Brought by Plaintiff Reynolds on Behalf of Herself and all Similarly Situated Employees**

130.     Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

131.     At all relevant times, Defendants have employed, and/or continue to employ, Plaintiffs within the meaning of the NCWHA.

132.     Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and promised wages, on the employee's regular payday.

133.     Defendants employed Plaintiff Reynolds, and similarly situated employees, within the State of North Carolina.

134.     At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to pay Plaintiffs all owed, earned, and promised wages, including for required pre-shift work performed by Plaintiffs, and at the appropriate overtime rate that Plaintiffs are lawfully entitled to for hours worked in excess of forty (40) in a single workweek.

33

135. Consistent with the above, Defendants' failure to pay Plaintiffs all owed, earned, and promised wages was in violation of N.C. Gen. Stat. § 95-25.6.

136. As a result of Defendants' unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

137. Defendants' failure to pay Plaintiffs all owed, earned, and promised wages, despite the fact that, upon information and belief, Defendants knew of their obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

138. As a result of Defendants' unlawful acts, Plaintiffs have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.6, 95-25.22(a), (a1), and (d).

## THIRD CAUSE OF ACTION
### Violation of the New Mexico Minimum Wage Act
### N.M. Stat. Ann. § 50-4-1, *et seq.*
### Brought by Plaintiff Martinez on Behalf of Herself and all Similarly Situated Employees

139. Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

140. At all relevant times, Defendants have employed, and/or continue to employ, Plaintiffs within the meaning of the NMMWA.

141. The NMMWA, pursuant to N.M. Stat. Ann. § 50-4-22, requires each covered

34

employer, including Defendants, to compensate all non-exempt employees at the applicable minimum wage rate for all hours worked, and at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

142.    The NMMWA, N.M. Stat. Ann. § 50-4-26(D), explicitly enables employees to bring an action against employers "for and on behalf of the employee or employees and for other employees similarly situated . . . ."

143.    Defendants employed Plaintiff Martinez, and similarly situated employees, within New Mexico.

144.    At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to pay Plaintiffs wages due under the NMMWA, including for pre-shift work performed by Plaintiffs, and at the appropriate overtime rate that Plaintiffs are lawfully entitled to for hours worked in excess of forty (40) in a single workweek, in weeks where Plaintiffs worked over 40 hours.

145.    Consistent with the above, Defendants' failure to pay Plaintiffs all wages due under the law was in violation of the NMMWA.

146.    As a result of Defendants' unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

147.    Defendants' failure to pay Plaintiffs all wages due in weeks where Plaintiffs worked over 40 hours, entitles Plaintiffs to "an additional amount equal to twice the unpaid or underpaid wages," under N.M. Stat. Ann. § 50-4-26(C).

35

148. As a result of Defendants' unlawful acts, Plaintiffs have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, interest, and attorneys' fees and costs, pursuant to N.M. Stat. Ann. § 50-4-26.

## FOURTH CAUSE OF ACTION
**Violation of the Family Medical Leave Act**
**29 U.S.C. § 2601,** *et seq.*
**Brought by Plaintiff Reynolds**

149. Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

150. The FMLA, pursuant to 29 U.S.C. § 2615(a), prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [the FMLA]," or "discharge[ing] or in any other matter discriminat[ing] against any individual for opposing any practice made unlawful by [the FMLA]."

151. Plaintiff Reynolds, after receiving approval to take intermittent FMLA leave in February 2017, was discharged from her employment, after being told that her performance would improve if she stopped taking so much FMLA leave, and despite receiving performance awards and positive feedback throughout the course of her employment.

152. Though Defendants cited poor performance for Plaintiff Reynolds' termination, the aforementioned circumstances provide reason to believe that such reviews were merely a pretext for terminating Plaintiff Reynolds.

36

153.    Shortly following her termination, Plaintiff Reynolds received a letter from Defendants stating that she owed them money for all sixty (60) hours of unaccrued PTO taken during her employment, but not yet "earned" back, including approximately forty (40) hours of which Defendants required her to take in place of her FMLA leave.

154.    Upon information and belief, Defendants terminated Plaintiff Reynolds' employment in retaliation of her taking intermittent FMLA leave, and/or in an effort to profit from the funds that Defendants stated Plaintiff Reynolds owed them, partially as a result of not yet "earning" all unaccrued PTO that Plaintiff Reynolds was required to substitute for approved FMLA leave.

155.    As a result of Defendants' unlawful retaliation in violation of the FMLA, Plaintiff Reynolds is entitled to all wages, salary, benefits, or other compensation denied to or lost by her, including back pay and front pay, any monetary losses sustained by Plaintiff Reynolds as a result of Defendants' FMLA violation, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 2617.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs, and all those similarly situated, collectively pray that this Honorable Court:

1.    Issue an Order certifying this action as a collective action under the FLSA, and designate Named Plaintiffs as representatives of all those similarly situated under the FLSA collective action;

37

2. At the earliest possible time, issue notice of this collective action, or allow Named Plaintiffs to do so, to all persons who were, are, or will be employed by Defendants nationwide as Financial Customer Associates, or in similar positions, at any time within the three (3) years prior to the date of commencement of this action through the date of judgment or final disposition in this action, and who were subject to Defendants' pre-shift work policy and who worked forty (40) or more hours in at least one workweek in which pre-shift work was performed, and/or who were paid bonus compensation pursuant to a Compensation Plan and worked overtime during any pay period for which a bonus was received, and/or who received student loan repayments pursuant to Defendants' student loan repayment program and worked overtime during any pay period in which Defendants made student loan repayments, and/or who received fitness reimbursements from Defendants and worked overtime during any pay period in which fitness reimbursements were made. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

3. Issue an Order certifying this action as a class action under the NCWHA, and designate Plaintiff Reynolds as a representative on behalf of all those similarly situated under the NCWHA class and designate the below signed counsel as class counsel;

4. Issue an Order certifying this action as a class action under the NMMWA, and designate Plaintiff Martinez as a representative on behalf of all those similarly situated under the NMMWA class and designate the below signed counsel as class counsel;

38

5.    Award Plaintiffs actual damages for unpaid wages and liquidated damages equal in amount for the unpaid compensation found due to Plaintiffs and the class as provided by the FLSA, 29 U.S.C. § 216(b); award Plaintiff Reynolds and employees in the North Carolina class actual damages for unpaid wages and liquidated damages equal in amount as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (a1); and award Plaintiff Martinez and employees in the New Mexico class actual damages for unpaid wages and liquidated damages equal in amount as provided by the NMMWA, N.M. Stat. Ann. § 50-4-26;

6.    Award Plaintiffs attorneys' fees, costs, and interest pursuant to the FLSA, U.S.C. § 216(b), pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (d), and pursuant to the NMMWA, N.M. Stat. Ann. § 50-4-26;

7.    Award Plaintiff Reynolds all wages, salary, benefits, or other compensation denied to or lost by her, including back pay and front pay, any monetary losses sustained by Plaintiff Reynolds as a result of Defendants' retaliation in violation of the FMLA, an equal amount of liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 2617; and

8.    Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this August 3, 2018

/s/ Gilda A. Hernandez
Gilda A. Hernandez (NCSB No. 36812)
Emma J. Smiley (NCSB No. 46407)
**THE LAW OFFICES OF GILDA A.
HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
esmiley@gildahernandezlaw.com

Christine E. Webber (#439368) *pro hac vice*
**COHEN MILSTEIN SELLERS & TOLL,
PLLC**
1100 New York Avenue, Suite 500 West
Washington, DC 20005
cwebber@cohenmilstein.com
Telephone: 202.408.4600
Facsimile: 202.408.4699

*Attorneys for Plaintiffs*

40

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 3, 2018, the foregoing **PLAINTIFFS'**
**FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT,**
was served in accordance with the Federal Rules of Civil Procedure on the
following:

**KEVIN SCOTT JOYNER**
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.
4208 SIX FORKS ROAD, SUITE 1100
RALEIGH, NC 27609
TELEPHONE: (919) 787-9700
FACSIMILE: (919) 783-9412
EMAIL: kevin.joyner@ogletreedeakins.com


**REGINA W. CALABRO**
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.
4208 SIX FORKS ROAD, SUITE 1100
RALEIGH, NC 27609
TELEPHONE: (919) 789-3178
FACSIMILE: (919) 783-9412
EMAIL: regina.calabro@ogletreedeakins.com


**ROBERT A. SAR**
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.
4208 SIX FORKS ROAD, SUITE 1100
RALEIGH, NC 27609
TELEPHONE: (919) 787-9700
FACSIMILE: (919) 783-9412
EMAIL: robert.sar@ogletreedeakins.com


**AUGUST W. HECKMAN, III**
MORGAN, LEWIS BOCKIUS LLP
502 CARNEGIE CENTER
PRINCETON, NJ 08540-6289
TELEPHONE: (609) 919-6600

41

FACSIMILE: (609) 919-6701
EMAIL: august.heckman@morganlewis.com

**RICHARD G. ROSENBLATT**
MORGAN, LEWIS BOCKIUS LLP
502 CARNEGIE CENTER
PRINCETON, NJ 08540-6289
TELEPHONE: (609) 919-6600
FACSIMILE: (609) 919-6701
EMAIL: richard.rosenblatt@morganlewis.com

*Attorneys for Defendants.*

Respectfully submitted,

*/s/ Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Emma J. Smiley (NCSB No. 46407)
THE LAW OFFICES OF GILDA A.
HERNANDEZ, PLLC
1020 Southhill Drive, Suite 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
esmiley@gildahernandezlaw.com

Christine E. Webber (#439368), *pro hac vice*
COHEN MILSTEIN SELLERS & TOLL,
PLLC
1100 New York Avenue, Suite 500 West
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
cwebber@cohenmilstein.com

42